UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                                        :
                                                                                   :        Chapter 11
BROADBAND TELECOM, INC., *et al.*, [1]         :
                                                                                   :        Case No. 25-73095 (AST)
                                                                                   :
                                                                                   :        (Joint Administration)
                                                                                   :
                                 Debtors.                             :
-----------------------------------------------------------x

**DECLARATION OF JOHN D. BAUMGARTNER IN SUPPORT OF THE DEBTORS' EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 363 AND RULES 2002 AND 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS (I) TO UTILIZE CASH COLLATERAL AND GRANT ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS; (II) MODIFYING THE AUTOMATIC STAY; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c); AND (IV) GRANTING RELATED RELIEF**

I, JOHN D. BAUMGARTNER, declare, pursuant to section 1746 of Title 28 of the United States Code, as follows:

1. I am the Chief Restructuring Officer ("CRO") of the Debtors and as such I am submitting this declaration (the "Declaration") in support of the Debtor's emergency motion (the "Motion") [2], pursuant sections 105(a), 361, 362, 363 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 and 4001-5 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of New York (the "Local Rules") for the entry of interim (the "Interim Order") and final

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (1) BB Servicer, LLC (3400); (2) Carriox Telecap LLC (4403); (3) Carriox Towercap LLC (1520); (4) Bridgevoice, Inc. (9499); and (5) Broadband Telecom, Inc. (0930). The location of the Debtor Broadband Telecom, Inc.'s principal place of business is 100 Quetin Roosevelt Blvd, Suite 503, Garden City, New York 11530, and the Debtors' service addresses in these Chapter 11 Cases is the same.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

orders (the "Final Order" and together with the Interim Order, the "Cash Collateral Orders"), *inter alia*, (i) authorizing the Debtors to utilize cash collateral and grant adequate protection, (ii) scheduling a final hearing pursuant to Rules 4001(b) and (c) of the Bankruptcy Rules, and granting related relief.

2. A description of the facts and circumstances surrounding these Chapter 11 Cases is set forth in the Baumgartner Declaration [ECF Doc. No. 36], which is incorporated herein by reference.

**A. The Debtors.**

3. Broadband Telecom and Bridgevoice each own 50% of the equity interests in BB Capital SPV, LLC ("BB Capital"). BB Capital's main operational focus is to hold loans and provide factoring services to Broadband Telecom and Bridgevoice.

4. Broadband Telecom and Bridgevoice are wholly owned subsidiaries of BB Carrier LLC (the "BB Carrier"), and were incorporated under the laws of the state of California and Delaware on March 14, 2005 and August 25, 2008, respectively.

5. Broadband Telecom and Bridgevoice provide voice termination services across the world. Operations mainly consist of a wholesale trading business in which originating telecommunication carriers are interconnected via Voice over Internet Protocol ("VOIP") in which the traffic is routed over the Broadband Telecom and Bridgevoice networks to local service providers and telecommunication carriers in the destination countries with whom they have established agreements to manage the completion or termination of calls. Upon providing services, Broadband Telecom and Bridgevoice invoice their customers and thereby generate receivables. BB Capital purchases the receivables of Broadband Telecom and Bridgevoice, thereby providing Broadband Telecom and Bridgevoice with working capital.

6. BB Servicer LLC ("BB Servicer", and together with BB Capital, and Broadband Telecom, the "BB Debtors") is a wholly owned subsidiary of BB Carrier and was organized under the laws of the state of Delaware. BB Servicer is a servicer for Broadband Telecom and Bridgevoice.

7. Carriox Telecap and Carriox Towercap are wholly owned subsidiaries of Carriox Holding LLC ("Carriox Holding"), and were incorporated under the laws of the state of Delaware in November 2020. Carriox Telecap and Carriox Towercap provide factoring services to the wholesale VoIP (Voice over Internet Protocol) carrier industry, SMS carriers, and cell tower infrastructure companies (the "Carriox Factoring Clients") by purchasing from the Carriox Factoring Clients, at a discount, the receivables the Carriox Factoring Clients generate by providing telecom services to their customers. Carriox Telecap and Carriox Towercap, in turn, sell the receivables they purchase from the Carriox Factoring Clients to Carriox Capital II LLC ("Carriox Capital" and together with BB Capital, the "SPVs"), which is also a wholly owned subsidiary of Carriox Holding.

**B. Secured Financing**

8. BB Capital and Carriox Capital, as non-debtor Borrowers[3], (ii) Bridgevoice and Broadband Telecom, as Receivable Generators, (iii) BB Servicer, (iv) Carriox Telecap and Carriox Towercap, as Factors, and CC Servicers, (v) Alter Domus LLC, as administrative and collateral agent ("Agent"), and (vi) EAVF.SLF CC Leverage SPV LLC; EAVF/SLF BB Leverage SPV, LLC, and AVF III US Aggregator, L.P. (collectively, the "Lenders") entered into that certain Credit Agreement dated as of August 6, 2024 (the "Credit Agreement") providing for a credit

---

[3] As it related to the Secured Financing, capitalized terms not otherwise defined shall have the meanings ascribed to them in the applicable Credit Agreement or Credit Document.

facility on the terms and conditions provided therein.[4] Each of the Debtors has jointly and severally guaranteed the due and punctual performance of all Receivables Generator Obligations and Servicer' obligations pursuant to the Credit Agreement and related docmentation. To secure their obligations under the Credit Agreement, certain of the Debtors granted to Agent, for the benefit of the Lenders, a security interest in substantially all of their assets pursuant to that certain Pledge and Security Agreement, dated as of August 6, 2024 (the "<u>Pledge and Security Agreement</u>").

9. Bankim Brahmbhatt, the Debtors' principal, and former Chief Executive Officer, signed a certain "Bad Acts Guaranty, " dated as of August 6, 2024, to guarantee the obligations under the Credit Agreement. On August 12, 2025, the Agent commenced an action in the Supreme Court, New York, Index No. 654771/2025, to enforce the Bad Acts Guaranty. On the Petition Date, Brahmbatt commenced a case under Chapter 11 of the Bankruptcy Code in this Court, Case No. 25-73100.

10. On July 21, 2025, the Lenders, with cooperation and approval from Agent, sent a notice pursuant to the Credit Agreement declaring that one or more Events of Default had occurred under Section 8.1 of the Credit Agreement and that one or more Grantor Events of Default had occurred under the terms of the Pledge and Security Agreement; and

11. On July 23, 2025, Agent gave notice of the occurrence of Events of Default, declared the outstanding Obligations under the Credit Agreement to be due and payable, and demanded immediate payment thereof; and

---

[4] This is an incomplete summary of the terms of the Credit Agreement. The full and complete terms are set forth in the Credit Agreement and related agreements. These facts are for explanatory purposes only, and all rights and defenses to claims under the Credit Agreement are reserved

12. On July 24, 2025, the Lenders commenced an action (the "DE Chancery Court Action") against the SPVs, the Debtors, Brahmbhatt, and Jigar Bhatt (collectively, the "Defendants") in the Court of Chancery of the State of Delaware ("Delaware Chancery Court").

13. On August 8, 2025, the Delaware Chancery Court issued a temporary restraining order prohibiting the Debtors and SPVs from, among other things, (i) transferring assets, (ii) purchasing receivables and (iii) transacting any business with a value in excess of $5,000, absent consent from the Lenders.

## C. The Corporate Governance Stipulation

14. In an effort to get the Chapter 11 Cases on the proper footing and in the spirit of working cooperatively with one of their largest stakeholders, the Debtors met and conferred with the Agent and the Lenders in an effort to avoid the filing by the Agent and the Lenders of a motion seeking the appointment of Chapter 11 trustee to administer these Chapter 11 Cases. After substantial arms-length negotiations, the parties have agreed to the terms of a Stipulation and Order Setting Forth the Terms of an Agreement Between the Debtors, SPVs, Bankim Brahmbhatt, Agent and Lenders [ECF Doc. No.: 17-1] (the "Governance Stipulation"), which provides, *inter alia*, for the appointment of Robert Warshauer as the Independent Manager or Independent Director of the Debtors' as applicable, and provides for the retention of John Baumgartner as the Debtors' Chief Restructuring Officer.

15. On August 22, 2025, the Debtors filed the *Debtors' Motion to Approve (i) Retention and Employment of Robert Warshauer as Independent Director to the Debtors Nunc Pro Tunc to August 21, 2025; (ii) Retention and Employment of John D. Baumgartner as Chief Restructuring Officer of the Debtors, Nunc Pro Tunc to the Petition Dates; and (iii) Approving and So Ordering*

*Proposed Stipulation Setting Forth the Terms of an Agreement Between the Debtors, SPVs, Bankim Brahmbhatt, Agent, and Lenders* [ECF Doc. No. 17] (the "Motion to Approve").

16. On September 17, 2025, the Court entered an order granting the Motion to Approve [ECF Doc. No. 41] ("Approval Order").

**D. Cash Collateral Stipulation**

17. The Motion requests entry of the proposed Stipulation and Order (the "Cash Collateral Stipulation"), attached as **Exhibit "A"** to the Motion, on an interim basis and on a final basis in accordance with the express terms thereof, (i) authorizing the use of the Lender's Cash Collateral and the granting of adequate protection (ii) modifying the automatic stay; and (iii) scheduling a final hearing on the motion (the "Final Hearing").

18. Pending the Final Hearing, use of cash collateral will be implemented on an interim basis subject to the Cash Collateral Stipulation.

19. The Debtors require the use of Cash Collateral to fund their operations. In the absence of the continued authorization to use Cash Collateral, the Debtors' ability to continue operating in the ordinary course of business will be jeopardized, causing immediate and irreparable harm to the Debtors' estates, their creditors, employees, and all other stakeholders by virtue of the loss of significant going-concern value. Thus, the Debtors' continued use of Cash Collateral is essential in order to enable the Debtors to meet the obligations of their ordinary operating costs and expenses during the pendency of the Chapter 11 Case. Among other things, the continued use of Cash Collateral will enable the Debtors to maintain business relationships with its customers, pay its employees, and satisfy other ordinary operational costs that are essential to preserve estate value by continuing to operate its business in the ordinary course.

20. The Agent and the Lenders have consented to the Debtor's continued use of Cash Collateral in accordance the budget (the "<u>Budget</u>"), which is annexed to the Cash Collateral Stipulation as Exhibit "A". Accordingly, the Court should authorize the Debtors to use Cash Collateral in accordance with the terms of the Budget.

21. The Cash Collateral Stipulation provides for the following material terms[5]:

- Subject to the terms and conditions set forth in the Stipulation and Order, the Agent and the Lenders authorize and consent to the Debtors' use of Cash Collateral from the date hereof, through and including the Termination Date (as defined below) (the "<u>Interim Cash Collateral Period</u>") up to an aggregate amount set forth in the Budget (the "<u>Cash Collateral Limit</u>"); <u>provided</u>, <u>however</u>, the consensual use of Cash Collateral may terminate at any time prior to the expiration of the Cash Collateral Period upon the occurrence of an Event of Default (as defined below).

- The Debtors are hereby authorized to use Cash Collateral of the Agent and the Lenders to pay their actual, necessary, post-petition expenses, only in accordance with the budget attached to the Motion as **Exhibit A** (the "<u>Budget</u>") and the terms of the Cash Collateral Stipulation. The Debtors shall not prepay any expenses without the prior written consent of the Agent and the Lenders. The Budget may not be modified or amended without the express written approval of the Agent and the Lenders. Debtors shall provide at least 5 business days' notice of any request to modify, amend or extend the Budget, and shall send a written report to the Agent and the Lenders at the end of each week comparing actual revenues and expenses to the amounts shown in the Budget.

- The Agent's and the Lenders' consent to the use of Cash Collateral is expressly conditioned on the appointment and continued service of John D. Baumgartner as Chief Restructuring Officer and Robert Warshauer being appointed and continuing to serve as the Debtors' Independent Director or Independent Manager, as applicable, to manage the Debtors' businesses and to administer the Chapter 11 Cases pursuant to the Governance Stipulation, as approved by the Approval Order.

- As adequate protection for the use of the Agent's and the Lenders' Cash Collateral on and after the Petition Date, as well as any diminution in value of the Agent's and the Lenders' Collateral, including as a result from the use of Cash Collateral pursuant to the Cash Collateral Stipulation:

---

[5] This is an incomplete summary of the terms of the Cash Collateral Stipulation. The full and complete terms, subject to the Court's approval, are set forth in the Cash Collateral Stipulation.

- Subject to the provisions of paragraph 12 of the Cash Collateral Stipulation, the Agent and the Lenders are hereby granted under sections 361, 362 and 363(e) of the Bankruptcy Code replacement liens and security interests (the "Replacement Liens") on all assets of the Debtors and their estates, whether now existing or hereafter acquired, and the proceeds, income, rents, profits and offspring of any of the foregoing, to secure the Debtors' use of Cash Collateral, whether pursuant to the Cash Collateral Stipulation or otherwise, and to secure any diminution of value in the Agent's and the Lenders' Collateral from and after the Petition Date (collectively, the "Replacement Lien Collateral"). The Replacement Liens (i) are subordinate only to the Carve-Out (as defined below), (ii) shall attach with the same rights and in the same order of priority that existed as to the Agent's and the Lenders' Collateral under applicable non-bankruptcy law (including by agreement of the Agent and the Lenders) as of the Petition Date, (iii) are automatically perfected, and (iv) exclude any and all claims or causes of action arising under chapter 5 of the Bankruptcy Code or applicable state fraudulent-transfer law and any proceeds thereof (together, "Avoidance Actions").

- Subject to the provisions of paragraph 12 of the Cash Collateral Stipulation, the Agent and the Lenders are granted pursuant to Bankruptcy Code sections 507(b) and 361, an allowed super-priority administrative expense claim in an amount not less than the aggregate amount of all Cash Collateral used on and after the Petition Date (whether under the Cash Collateral Stipulation or otherwise), plus the amount of any other diminution in the value of the Agent's and the Lenders' Collateral on and after the Petition Date, which super-priority administrative expense claim shall have priority over any and all other administrative expenses of the kind specified in, or ordered pursuant to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507(a), and 507(b). No costs or administrative expenses which have been or may be incurred in the Debtors' chapter 11 cases or in any subsequent case(s) under chapter 7 of the Bankruptcy Code, and no priority claims, are or will be prior to or on a parity with the respective claims of the Agent and the Lenders except for costs, if any, imposed by a final order of the Bankruptcy Court, after notice and a hearing, against the Agent's and the Lenders' Collateral under section 506(c) of the Bankruptcy Code.

- The Debtors' consensual use of Cash Collateral terminates on the earlier of (a) the November 9,2025, or (b) upon the occurrence of an Event of Default (as defined below) ("Termination Date"). Each of the following shall constitute an "Event of Default": (a) the appointment of a chapter 11 trustee, (b) the conversion of any of the Debtors' cases to a chapter 7 case, (c) the lifting of the automatic stay to allow the Agent, the Lenders or any other secured creditor to foreclose its liens on any material portion of the Agent's and the Lenders' Collateral, (d) the occurrence of a default (following the expiration of any

applicable cure period) or termination event under any financing facility or order or stipulation approving the use of cash collateral in the bankruptcy cases of the Debtors (notice of which will be given to the Agent and the Lenders within two (2) business days), (e) the entry of any order granting relief under section 506(c) of the Bankruptcy Code with respect to any of the Collateral, (f) the Debtors' failure to comply with any provision of the Cash Collateral Stipulation (notice of which will be given to the Agent and the Lenders within two (2) business days) or any provision of the Cash Collateral Stipulation shall no longer be effective for any reason, or (g) John D. Baumgartner shall no longer be serving as the Debtors' Chief Restructuring Officer or Robert Warshauer shall no longer be serving as the Debtors' Independent Director or Independent Manager. The Agent and the Lenders shall be required to provide written notice to the Debtors of any default under items (d) and (f) above and the Debtors shall have five (5) business days to cure any such default. In addition, in the event of the occurrence of any Event of Default under the Cash Collateral Stipulation (unless such Event of Default is specifically waived in writing by the Agent on behalf of the Lenders, which waiver shall not be implied from any other action, inaction or acquiescence by the Agent or the Lenders), this Bankruptcy Court may, upon the request of the Debtors, conduct an emergency hearing five (5) days following the occurrence of any Event of Default (or as soon thereafter as this Bankruptcy Court's schedule permits)) at which time the Debtors, or any successor in interest to the Debtors' estates as the case may be, shall have the burden to show cause why the Bankruptcy Court should not (i) vacate and modify the automatic stay provided for pursuant to Bankruptcy Code Section 362 and any other restrictions on the enforcement by the Agent and the Lenders of their liens upon and security interests in the Agent's and the Lenders' Collateral or any other rights under the Loan Documents granted to or for the benefit of the Agent and the Lenders, or pursuant to the Cash Collateral Stipulation and Order or otherwise, and (ii) authorize the Agent and the Lenders, without further notice, hearing or approval of the Bankruptcy Court, in the sole discretion of the Agent and the Lenders, to take any and all actions or remedies which the Agent and the Lenders may deem appropriate to proceed against and realize upon the Agent's and the Lenders' Collateral and any other property of the Debtors' estate upon which the Agent and the Lenders have been or may hereafter be granted liens and security interests to obtain indefeasible repayment in full of all obligations.

- The Agent's and the Lenders' security interests in and liens upon any of the Agent's and the Lenders' Collateral securing the Prepetition Loan Indebtedness, and the super-priority administrative expense claim granted to the Agent and the Lenders pursuant to the terms of the Cash Collateral Stipulation and Order shall be subordinate only to (i) the fees and expenses of the Clerk of this

Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and any applicable interest due pursuant to 31 U.S.C. § 3717; (ii) the Allowed Professional Fees (as defined below) incurred prior to the termination of Debtors' right to use Cash Collateral in accordance with the Cash Collateral Stipulation and Order, in excess of the retainers held by the Estate Professionals (defined below), up to an aggregate amount not to exceed $1,000,000 in the aggregate for all Estate Professionals; and (iii) all fees and expenses up to $10,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (collectively, the "Carve-Out"). For purposes of this paragraph, the "Allowed Professional Fees" shall mean the outstanding and unpaid commissions, fees and expenses incurred in accordance with the Budget and awarded or allowed by final orders of the Court to the Debtors and any professionals retained by the Debtors or any official committee (the "Estate Professionals"), subject to the rights and interests of all parties in interest of this case to object to the allowance and/or payment of any commissions, fees and expenses requested by any Estate Professional, provided, however, that the payment of Allowed Professional Fees on account of the Carve-Out shall be made only from Cash Collateral generated from the operations of the estates' business during the Chapter 11 Cases. The Agent and the Lenders shall have absolutely no obligation, liability or duty whatsoever to pay, fund or otherwise ensure the payment of any Carve-Out. Furthermore, the Carve-Out shall not be used for the payment or reimbursement of any fees or disbursements of the Debtors or any Estate Professional incurred in connection with the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (i) invalidating, setting aside, avoiding, subordinating, in whole or in part, the Prepetition Loan Indebtedness or the liens and security interests in any of the Agent's and the Lenders' Collateral granted in favor of the Agent and the Lenders; or (ii) preventing, hindering or delaying the Agent's and the Lenders' assertion or enforcement of its liens. Other than with respect to the Carve-Out, the Agent and the Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professionals or any other professionals incurred in connection with the Chapter 11 Cases or any succeeding case(s) under the Bankruptcy Code and nothing in this paragraph shall be construed to obligate the Agent or the Lenders in any way to pay compensation or expense reimbursement to Estate Professionals or to assure that the Debtors have sufficient funds on hand to pay such compensation or expense reimbursement. Except as provided for herein, no other claim shall be granted or allowed with priority superior to or *pari passu* with the priority of the claims of the Agent and the Lenders granted by this Stipulation and Order in favor of the Agent and the Lenders while any Prepetition

Loan Indebtedness remains outstanding. Any payment or reimbursement made by or on behalf of the Agent and the Lenders at any time in respect of any Allowed Professional Fees pursuant to this paragraph shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  The Carve-Out shall survive conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

- Subject to entry of the a final order containing the section 506(c) waiver of paragraph 13 of the Cash Collateral Stipulation, the Debtors, on behalf of themselves and their bankruptcy estates, waive any and all claims, rights and powers to surcharge the Agent, the Lenders, the Lenders' Collateral and any other property or assets of the Debtors subject in any manner whatsoever to the liens and security interests of the Agent and the Lenders (including the Replacement Liens) pursuant to section 506(c) or section 105(a) of the Bankruptcy Code.

- The provisions of the Cash Collateral Stipulation and Order shall be binding on and inure to the benefit of the assigns, representatives and successors of the parties hereto, including any Trustee appointed by the Court under chapter 11 or chapter 7 of the Bankruptcy Code, and all creditors and other parties in interest. Notwithstanding the foregoing, the Agent and the Lenders shall have no obligation to permit the use of the Agent's and the Lenders' Collateral, including Cash Collateral, or extend any financing to any trustee or similar responsible person appointed for the estate of any of the Debtors.

- Nothing in the Cash Collateral Stipulation and Order shall obligate the Agent and the Lenders with respect to any plan of reorganization or sale that may be proposed in these cases or shall constitute a waiver of any right or remedy of the Agent and the Lenders, including the right to seek relief from the automatic stay, to seek conversion or dismissal of these cases, to enforce any guarantees against any party other than the Debtors, including, without limitation, Bankim Brahmbhatt, or to oppose confirmation of any plan of reorganization or sale proposed by the Debtors.  Nothing in the Cash Collateral Stipulation and Order shall constitute an agreement or admission by the Agent or the Lenders as to the value of the Agent and the Lenders' Collateral or the treatment of their claims under any plan of reorganization. The approval of the Budget does not prohibit any party in interest from objecting to any specific request to allow a claim or other expense that is identified generally in the Budget.

- The provisions of the Cash Collateral Stipulation and Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in the Chapter 11 Cases; (b) converting the Chapter 11 Cases to chapter 7 cases; (c) dismissing the Chapter 11 Cases; or (d) appointing a trustee, and the terms and provisions of this as well as the Replacement Liens granted pursuant to the Cash Collateral Stipulation shall continue in full force and effect notwithstanding the entry of such order, and such Replacement Liens

shall maintain their priority as provided by the Cash Collateral Stipulation and Order until all of the Prepetition Loan Indebtedness is indefeasibly paid in full and discharged on terms acceptable to the Agent and the Lenders.

22. As set forth in the Cash Collateral Stipulation, the Agent and the Lenders will receive adequate protection of their prepetition interests in the Cash Collateral in the form of (a) preservation and enhancement of collateral value through the ability to continue operating the Debtors' businesses to create additional receivables and cash, (b) senior first priority replacement liens with respect to the Lender's Collateral and (c) an allowed super-priority administrative expense claim in an amount not less than the aggregate amount of all Cash Collateral used on and after the Petition Date (collectively, the "Adequate Protection").

23. The Debtors respectfully submit that the Adequate Protection will sufficiently protect the Agent and the Lenders interests in the Cash Collateral from any diminution in value and should be approved.

**E. Conclusion**

24. The Debtors have an urgent and immediate need for the use of Cash Collateral to continue to operate. Currently, the Debtors does not have sufficient unencumbered funds with which to operate its business on an ongoing basis. Absent authorization from the Court to use Cash Collateral, as requested, on an interim basis pending the Final Hearing, the Debtors and their estates will be immediately and irreparably harmed. The availability of Cash Collateral will provide necessary assurance of the Debtors' ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' businesses to the detriment of all parties in interest. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating its reorganization efforts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed this 24th day of September 2025 in New York City.

*[signature]*

John D. Baumgartner